IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

EVELYN S. MERRITT, AND SHARON L.      *
MERRITT MCMILLEN, INDIVIDUALLY AND   *
AS TRUSTEE OF THE MERRITT LIVING TRUST,  *
                                        *

     Plaintiffs,                                *
                                        *

v.                                     *     No. 1:17-CV-040-JRH-BKE
                                        *

NEXTON MINING, INC. SUNFLOWER FARM &   *
RANCH, INC. STEVEN L. PETERS, KIMBERLY K.  *
PETERS, AND ROSS A. WENGER,         *
                                        *

     Defendants.                             *

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY THE PROCEEDINGS**

Defendants moved to dismiss or to stay this action on May 10, 2017. (Doc. no. 17.) After obtaining an extension of time, Plaintiffs filed their response on June 7, 2017.[1] (Doc. no. 36.) For the reasons explained in Defendants' principal memorandum and herein, the motion to dismiss should be granted. In the alternative, a stay is indeed warranted pursuant to Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976).

## I. Argument

**A.     The Mere Continuing Presence of Sediment as a Result of Past Discharges is Not an "Ongoing Violation" so as to Support a Clean Water Act ("CWA") Citizen Suit.**

Plaintiffs argue the alleged continuing presence of sediment constitutes an "ongoing violation" of the CWA under Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49 (1987). Plaintiffs assert their position is supported by the clear weight of authority, but they concede there is "no Eleventh Circuit case directly on point" (doc. no. 36 at 4) and rely chiefly upon two unpublished district court cases from this District and one published opinion from the Northern District of Georgia. (Id. at 5 (citing Jones Creek Investors, LLC v. Columbia

---

[1] In the meantime, the parties jointly requested the Court to stay all discovery pending the Court's ruling on Defendants' motion, which the Court granted on May 25, 2017. (See doc. no. 33, granted by, doc. no. 35.)

County, Georgia, et al., No. 111-CV-174, 2013 WL 1338238, at *10-13 (S.D. Ga. Mar. 28, 2013); Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc., No. 608-CV-064, 2009 WL 2390851, at *8 (S.D. Ga. Aug. 4. 2009); & City of Mountain Park, Ga. v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1297 (N.D. Ga. 2008)).)

The question is *not* well-settled. As the Jones Creek court observed, this issue poses a "difficult problem." 2013 WL 1338238, at *12. The judicially-crafted distinction between fill material and other pollutants posed by Plaintiffs' cited cases has not been adopted by ***any*** circuit-level authority. As noted in Defendants' initial brief, in Crigler v. Richardson, No. 3:08-681, 2010 WL 2696506, at *5 (M.D. Tenn. July 7, 2010),[2] the court expressly rejected Mountain Park and likeminded cases:

> As to the "previous dumping" issue, again, there is a split of authority on this issue. That is, as the plaintiffs pointed out in initial briefing and again here, some courts have indicated that "so long as material deposited in a water of the United States remains in those waters," the violation is not wholly past. (Docket No. 202 at 11–12 citing City of Mountain Park Georgia v. Lakeside at Ansley, *LLC.*, 560 F. Supp. 2d 1288 (N.D. Ga. 2008); Hernandez v. Esso Standard Oil Co., 597 F. Supp. 2d 272, 286 (D.P.R. 2009); Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc., 962 F. Supp. 1312, 1322 (D. Or. 1997)). And, several courts have concluded that, once the polluter ceases his active pollution, the violation is wholly past.
>
> In this context, the court looked for guidance from the Sixth Circuit and other district courts in this Circuit. While neither side came forward with direct Sixth Circuit authority, all indications from the Sixth Circuit cases cited in the Memorandum are that, if the Sixth Circuit were to consider this exact issue, it would find that the plaintiffs alleged a "wholly past" violation. That is, again, in both Allen County [Citizens for the Environment, Inc. v. BP Oil Co., 1992 WL 138410 (6th Cir. 1992)] and Ailor v. City of Maynardville, 368 F.3d 587, 598 (6th Cir. 2004), the Sixth Circuit focused on the defendants' conduct and whether the defendants were actively polluting at the time that the Complaint was filed, and the court did not focus on any possibility that the defendant would be liable under the CWA for the consequences of active pollution that had ceased by the time that the Complaint had been filed.

Crigler, 2010 WL 2696506, at *5.

---

[2] Although Plaintiffs characterize Crigler as an "outlier," it is consistent with reasoning employed by the Sixth Circuit, the Second Circuit, and other authorities, as explained in Defendants' principal brief. (See doc. no. 17 at 11-12 (citing cases).)

With no binding authority on point, and no appellate level authority directly addressing the issue, Defendants respectfully contend the Sixth Circuit's approach in <u>Ailor v. City of Maynardsville</u>, 368 F.3d 587, 598 (6th Cir. 2004), relied upon by <u>Crigler</u>, is instructive: The focus should be on whether Defendants' alleged conduct constitutes *active* pollution, not whether there are ongoing consequences of Defendants' wholly past conduct. In this regard, treating sediment differently from other pollutants may be wise policy, but this approach is fundamentally flawed because the text of the CWA does not authorize it.

The problem with <u>Jones Creek</u>, <u>Mountain Park</u>, and likeminded cases is they create a distinction between sediment and other pollutants that the statutory framework of the CWA does not support. <u>Mountain Park</u> (upon which <u>Jones Creek</u> relied) was wrongly decided because it failed to recognize the difference between citizen enforcement under § 505(a) of the CWA and government enforcement under § 309. Unlike private citizens, the government can enforce CWA violations that are "wholly past." <u>See, e.g.</u>, <u>Gwaltney</u>, 484 U.S. at 58.

The <u>T.C. Logging</u> case, which is similarly flawed, did not directly involve jurisdiction under <u>Gwaltney</u>, but included a one-sentence quotation from <u>Gwaltney</u> in concluding that the CWA claim in that case was not ***moot***. <u>See</u> 2009 WL 2390851, at *8. Neither case provides a persuasive basis for concluding that <u>Gwaltney</u> is satisfied by the mere continued presence of alleged pollutants.

In <u>Mountain Park</u>, the district court considered whether sediment discharged from construction sites constituted a continuing violation when it remained in the plaintiff's lake, even though the construction activity had ceased.[3] The court rejected the § 505 and <u>Gwaltney</u>-based reasoning of <u>Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.</u>, 989 F.2d 1305, 1312-13 (2d Cir. 1993). In <u>Remington</u>, the Second Circuit considered whether the wholly-past

---

[3] Of course, the instant action does not involve a "construction site," but improvements to existing agricultural property.

discharge of lead shot and clay targets could support a lawsuit under § 505, either under § 402 or as fill material under § 404. The <u>Remington</u> court first found that the original complaint only alleged discharges that had ceased prior to the complaint's filing, because the defendant had ceased operations by that time. <u>Remington</u>, 989 F.2d at 1312. The Second Circuit thus implicitly held that the mere continued presence of fill material did not support jurisdiction. The panel then considered whether an amended complaint, alleging that decomposition of the lead shot constituted a continuing violation, could support a citizen suit. The Second Circuit rejected the plaintiffs' argument, stating "the present violation requirement of the Act would be completely undermined if a violation included the mere decomposition of pollutants." <u>Id.</u> at 1313. Logically included within this statement is the lesser proposition that the mere continued presence of fill cannot constitute a "present violation."

Rejecting this rationale, the <u>Mountain Park</u> court adopted the reasoning of cases holding that the failure to remove previously discharged material constitutes an ongoing violation, relying on <u>North Carolina Wildlife Federation v. Woodbury</u>, No. 87-584-CIV-5, 1989 WL 106517 (E.D.N.C. Apr. 25, 1989). Like Plaintiffs, the <u>Mountain Park</u> court found particularly persuasive the <u>Woodbury</u> court's citation to Justice Scalia's concurrence in <u>Gwaltney</u>. <u>See</u> <u>Mountain Park</u>, 560 F. Supp. 2d at 1293–94. Like Plaintiffs, <u>Mountain Park</u> and <u>Woodbury</u> relied on the following passage from that concurrence:

> The phrase in *§ 505(a)*, "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act – the opposite of a state of compliance. A good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated. **When a company has violated an effluent standard or limitation, it remains, for purposes of *§ 505 (a)*, "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the *cause* of the violation.**

<u>Gwaltney</u>, 484 U.S. at 69 (Scalia, J., concurring) (emphasis added); <u>see also</u> <u>Mountain Park</u>, 560 F. Supp. 2d at 1294; <u>Woodbury</u>, 1989 WL 106517, at *2.

However, <u>Mountain Park</u> and <u>Woodbury</u> drew an incorrect conclusion from Justice Scalia's concurrence. At issue in <u>Gwaltney</u> was not the remediation of residual *effects* of past discharges, but steps to eliminate the *cause* of those discharges. <u>Gwaltney</u> concerned discharges of pollutants, including total Kjeldahl nitrogen ("TKN"), in waste water from a meatpacking plant into the Pagan River. 848 U.S. at 53. The remedial measures to which Justice Scalia referred were not the remediation of the river, but correcting the discharger's equipment and operation to eliminate the cause of the TKN discharge. <u>Id.</u> at 69-70.

Albeit in a different context, at least one district court in this Circuit has rejected <u>Woodbury</u> as contrary to the Eleventh Circuit's reasoning in <u>Nat'l Parks & Conservation Ass'n, Inc., v. Tenn. Valley Auth.</u>, 502 F.3d 1316 (11th Cir. 2007), a Clean Air Act case cited in Defendants' principal brief. <u>See</u> <u>Friends of Warm Mineral Springs, Inc. v. McCarthy</u>, No. 8:13-CV-3236-T-23TGW, 2015 WL 2169241 at *2-4 (M.D. Fla. May 8, 2015) (rejecting <u>Woodbury</u> and explaining in context of CWA's statute of limitations that CWA forbids the introduction of pollutants, not their continuing presence). The <u>McCarthy</u> court rejected the plaintiffs' argument that the continued presence of "'offsite' sand, fifty-five gallon drums, and plastic sheeting" constituted an ongoing violation of the CWA, instead concluding that "a violation of Section 1311(a) occurs only at the introduction of a pollutant into water." <u>Id.</u> at *2. The <u>McCarthy</u> court reasoned:

> To determine whether an ongoing obligation is imposed, courts look first to the language of the statute. "Where a statute is unambiguous and there is no room for interpretation or construction of [a] provision, [a court] cannot circumvent its clear words." Courts have split as to whether the CWA creates a continuing obligation to remedy the effects of violations. The section of CWA at issue prohibits the "discharge of any pollutant," "[e]xcept in compliance with" with certain other sections of the CWA. 33 U.S.C. § 1311(a). For the purposes of this case, the CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." Id. § 1362(12)(A). "Addition" can mean either "the act or process of adding" or "the result of adding." Section 1311(a)'s use of the

5

> phrase "in compliance with" and the placement of "by any person" behind the word "discharge" point [ ] toward the former definition, which indicates a discrete action, instead of the result of that action. Ordinarily, one speaks of an action done "by a person," "in compliance with" rules. This ordinary meaning is dispositive. Once the violator stops adding a pollutant in violation of a permit, the violation itself is over. What remains are the effects of the violation, but absent a continuing obligation that is itself violated, the effects are not themselves violations. A discharge in violation of the obligation at issue under § 1311(a) is not a continuing violation on the basis that the discharger fails to remedy its effects.

(citations and footnotes omitted). In short, Section 1311(a) prohibits only the release of a pollutant, not the presence of a pollutant. Thus, in this action, the release of the sand, the drums, and the sheeting into the springs (not their presence in the springs) constitutes the violation of Section 1311(a). Because the sand, the drums, and the sheeting were released into the springs more than five years before the start of this action, the five-year limitation in 28 U.S.C. § 2462 bars this action.

McCarthy, 2015 WL 2169241, at *2–3 (M.D. Fla. May 8, 2015) (quoting United States v. Rutherford Oil Corp., 756 F. Supp. 2d 782, 790-91 (S.D. Tex. 2010)).  In accord with Nat'l Parks and McCarthy, Defendants ask the Court to follow the plain language of the CWA, rather than the policy-driven rationales of Mountain Park, Woodbury, and similar cases.

In reaching a contrary conclusion, Mountain Park relied heavily on cases addressing the broad reach of *government* enforcement actions under § 309.  See 560 F. Supp. 2d at 1294 (citing Sasser v. EPA, 990 F.2d 127 (4th Cir. 1993)). While assessing *per diem* penalties under § 309(g), the Fourth Circuit in Sasser held that the violation was continuing so long as "the pollutant remains in the wetland without a permit."  990 F.2d at 129. The Sasser court cited other government enforcement actions in support of its holding. See id. (citing United States v. Ciampitti, 669 F. Supp. 684, 700 (D.N.J. 1987); United States v. Cumberland Farms, 647 F. Supp. 1166, 1183-84 (D. Mass. 1986), aff'd, 826 F.2d 1151 (1st Cir. 1987)).  The Mountain Park court claimed support from these § 309 cases, while ignoring the distinction between the plain language and intent of § 505 and § 309's language authorizing government

enforcement. In following <u>Woodbury</u> and relying on inapplicable § 309 authority,[4] the <u>Mountain Park</u> court chose to reject admittedly "well-reasoned" authority interpreting § 505. <u>See Mountain Park</u>, 560 F. Supp. 2d at 1296.

In <u>T.C. Logging</u>, a riverkeeper organization alleged that the construction and ongoing existence of a logging road in wetlands without a § 404 dredge and fill permit violated the CWA. The defendant logging company argued, among other things, that the case was moot, but did not deny its violation was ongoing. The court rejected the mootness argument for several reasons and then cited <u>Sasser</u> for the proposition that "the alleged violation continues so long as the fill remains in the wetland." <u>T.C. Logging</u>, 2009 WL 2390851, at *8 (citing <u>Sasser</u>, 990 F.2d at 129).

In addition to the fact that it involved a separate issue (i.e., mootness), <u>T.C. Logging</u> (like <u>Mountain Park</u>) looked to inapplicable authority for its dicta regarding the presence of pollutants. Whereas <u>T.C. Logging</u> was a citizen suit, as noted above, <u>Sasser</u> was an EPA action under § 309 of the CWA, 33 U.S.C. § 1319. <u>T.C. Logging</u> reached its conclusion without analysis and without recognizing the distinction (made by the Supreme Court in <u>Gwaltney</u>) between the government's statutory authority to enforce wholly past actions (and their continuing consequences) and a citizen's more limited ability to enforce only current violations. <u>See generally</u> <u>T.C. Logging</u>, 2009 WL 2390851.

Here, with the single asserted exception of alleged discharge from a "berm" (addressed *infra*), the alleged cause of the discharge is past land-clearing activities which ceased years ago. There is no ongoing discharge—*i.e.*, no addition of a pollutant from a point source—and therefore no ongoing violation. The continued presence of pollutants does not satisfy <u>Gwaltney</u>,

---

[4] In finding a continuing violation, <u>Woodbury</u> relied on the same § 309 government enforcement cases as <u>Sasser</u>. <u>See</u> <u>Woodbury</u>, 1989 WL 106517, at *2, (citing <u>Tull</u>, 615 F. Supp. at 626, and <u>Ciampitti</u>, 669 F. Supp. at 700 (both government enforcement actions under 33 U.S.C. § 1319)).

and contrary cases are flawed for the reasons explained here and in Defendants' principal brief. This Court should reject the approach taken in <u>Woodbury</u> and its progeny.[5]

**B.      Plaintiffs' Allegations Regarding the "Berm" Do Not State an Ongoing Violation.**

If the Court determines that the mere presence of fill material caused by past alleged violations does not constitute an ongoing violation, that will significantly narrow the scope of Plaintiffs' suit.   Nevertheless, Plaintiffs also argue that the alleged presence of a "berm" constitutes a continuing discharge.   Although Plaintiffs claim in their responsive brief that Defendants' alleged "ongoing failure and refusal to stabilize" the berm is causing additional erosion and the ongoing addition of "fill material into jurisdictional wetlands," the problem with this argument is that it cannot be squared with material attached to Plaintiffs' complaint and public records.[6]

At the outset, what Plaintiffs refer to as a "berm" perhaps merits some explanation.   The berm is part of erosion control improvements installed in the uplands of the existing agricultural property to limit the flow of excess sediment and water from the property.   33 U.S.C. § 1344(f)(1)(c) expressly provides that the discharge of dredged material "for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches" is expressly defined as a "[n]on-prohibited discharge of dredged or fill material" under the Act.

---

[5] Plaintiffs cite a list of other district court cases which support their position.  (<u>See</u> doc. no. 36 at n.1.)  However, a quick perusal of these cases shows that they rely upon <u>Woodbury</u> and its line of reasoning.  These cases add nothing to the discussion.

[6] Although chiefly styled as a Rule 12(c) motion, Defendants' motion also challenges the Court's subject matter jurisdiction over Plaintiffs' CWA suit, mainly by challenging the sufficiency of Plaintiffs' pleading.  With respect to facial challenges, the Court should take Plaintiffs' allegations as true and determine whether they sufficiently allege a basis for CWA jurisdiction.  <u>See, e.g.</u>, <u>Jones Creek</u>, 2013 WL 1338238, at *4 (citing <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 924 n. 5 (11th Cir. 2003); & <u>Scarfo v. Ginsberg</u>, 175 F.3d 957, 960 (11th Cir. 1999)).  However, with respect to factual challenges, such as Defendants' arguments respecting the "berm" and pre-suit notice, the Court is free to weigh the evidence and may consider matters outside the pleadings.  <u>See</u> <u>id.</u> (citing <u>Lawrence v. Dunbar</u>, 919 F.2d 1525, 1528-29 (11th Cir. 1990); & <u>Scarfo</u>, 175 F.3d at 960).

The berm contrasts sharply to the "piles of discarded overburden" and "piles of debris" addressed in Parker v. Scrap Metal Processors, Inc., 386 F.3d 993 (11th Cir. 2004), and Sierra Club v. Abston Const. Co., Inc., 620 F.2d 41 (5th Cir. 1980), upon which Plaintiffs rely. Piles of debris and discarded overburden created during strip mining are a far cry from the erosion control improvements or "berm" at issue here—a measure which is expressly defined as a "[n]on-prohibited discharge of dredged or fill material" under the Act. In fact, the Parker panel concluded that the "pile of debris" could constitute an on-going violation where the property "had no controls for surface water." Parker, 386 F.3d at 1010. In the instant case, the "berm" is the very sort of surface water control which was missing in Parker. The berm is not an ongoing violation under Parker or Abston because the berm is an erosion control improvement installed in the uplands of the property and, to the extent Plaintiffs allege a discharge from the berm, it is expressly excluded from the Act as a "non-prohibited discharge of dredged of fill material."

Plaintiffs allege the berm was constructed in 2014-15. (Compl. ¶ 84.) After more than a year of litigation in state court, Plaintiffs now carefully allege in their federal complaint that the berm went unstabilized "from 2014 through early 2016." (Id. ¶ 91.) It is true that Plaintiffs also conclusorily allege that "much" of the berm remains unstabilized and continues to erode, causing an ongoing discharge into waters of the United States. (Id. ¶ 92.) However, Plaintiffs' conclusory allegations regarding the berm cannot be squared with aerial photography they rely upon as proof they have provided adequate pre-suit notice, as well as public records. The berm, visible in Plaintiffs' aerial photographs (see doc. no. 1-1 at 7-9), is located on uplands, and it is not adjacent to any stream, wetlands, or Plaintiffs' property. (See Jefferson County, Georgia Tax Map of Parcel 0025021, attached as Ex. 1; Jefferson County, Georgia Tax Map of Parcel 0025015, attached as Ex. 2.)

Nothing in Plaintiffs' pleading explains their (at minimum) counterintuitive claim that the berm actually (1) causes Plaintiffs to suffer an injury in fact[7] or (2) causes sediment to flow into jurisdictional waters. As explained above, the berm is part of erosion control improvements made to *prevent* the discharge of sediment. The berm is also not adjacent to Plaintiffs' property or wetlands.

"The CWA only prohibits the discharge of pollutants into 'navigable waters.' See 33 U.S.C. §§ 1311(a), 1362(12). 'Navigable waters' are defined as 'the waters of the United States, including the territorial seas.' Id. at § 1362(7)." Jones Creek Inv'rs, LLC v. Columbia Cty., Ga., 98 F. Supp. 3d 1279, 1304 (S.D. Ga. 2015). Under binding Eleventh Circuit authority, see id. (citing United States v. Robison, 505 F.3d 1208, 1221–22 (11th Cir. 2007)), Plaintiffs must show more than a hydrologic connection between some body of water allegedly affected by the berm and jurisdictional waters; they must also demonstrate a "significant nexus" between whatever body of water/wetlands the berm allegedly affects and a water of the United States—in other words, that the berm has "a significant effect on the 'chemical, physical, and biological integrity'" of a navigable waterway. Id. at 1308. Aside from a bare conclusion, Plaintiffs offer no *facts* to support such a claim. In sum, Plaintiffs' unexplained and conclusory reference to ongoing "discharges" from the berm does not demonstrate the existence of an ongoing violation of the CWA which causes injury in fact to Plaintiffs. Defendants' motion to dismiss should be granted.

## C.     Plaintiffs' Notice Letter, Reviewed in Context, Failed to Provide Adequate Notice.

Simply because Plaintiffs say they provided adequate pre-suit notice does not make it true. "The notice requirement is 'strictly construed to give the alleged violator the opportunity to

---

[7] "To demonstrate standing, Plaintiff[s] ha[ve] the burden to show (1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Jones Creek Inv'rs, LLC v. Columbia Cty., Ga., 98 F. Supp. 3d 1279, 1297 (S.D. Ga. 2015) (citing Friends of the Earth, Inc. v. Laidlaw Environmental Servs., 528 U.S. 167, 180–81 (2000); Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1278–80 (11th Cir. 2015).

correct the problem before a lawsuit is filed.'" Jones Creek, 2013 WL 1338238, at *9 (quoting Nat'l Parks, 502 F.3d at 1329); see also Mrosek v. City of Peachtree City, 539 Fed. App'x 938, 940 (11th Cir. 2013). When Plaintiffs' Notice of Intent To Sue ("NOI") is viewed in context, it is apparent Plaintiffs failed to provide adequate notice regarding the location of the alleged violations.

Inherent in the prerequisite that the plaintiff provide "sufficient information to permit the recipient to identify…the activity alleged to constitute a violation" is the requirement that the plaintiff identify the alleged action and its location. 40 C.F.R. § 135.3; Purvis v. Douglasville Dev., LLC, No. 1:06CV0415 WSD, 2006 WL 3709610, at *3 (N.D. Ga. Nov. 9, 2006) (explaining "Plaintiffs must 'provide enough information to enable both the alleged violator and the appropriate agencies to identify the pertinent aspects of the alleged violations without undertaking an extensive investigation of their own'") (quoting Atwell v. KW Plastics Recycling Division, 173 F. Supp. 2d 1213, 1222 (M.D. Ala. 2001)). The notice must explain "the who, what, when and where of the alleged violation." Purvis, 2006 WL 3709610, at *3.

"'In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective action will avert the lawsuit.'" Carney v. Gordon Cty., Georgia, No. CIVA 4:06CV36 RLV, 2006 WL 4347048, at *5 (N.D. Ga. Sept. 12, 2006) (quoting Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co., 116 F.3d 814, 819 (7th Cir. 1997)). If the notice fails to provide the locations of the alleged violations, it leaves the defendant to guess where the alleged violations occurred. This is contrary to the policy underlying the notice requirement.

Plaintiffs rely on aerial photographs and the statement that the alleged violations occurred "on the southwestern border and eastern portions of Parcel No. 0025021 and southeastern portion of Parcel No. 0025015." When Plaintiffs' statement is applied to the specific parcels identified, however, it becomes clear that the statement provides very little real information regarding

where Plaintiffs allege the violations occurred.[8] Parcels 0025021 and 0025015 comprise over 234.33 acres, which in turn are a portion of a large, contiguous agricultural field comprising approximately 650 acres. (See doc. no. 17-1, ¶ 27.) Plaintiffs' notice does not explain what it means by the "southwestern border" or "eastern portions" of Parcel No. 0025021 or the "southeastern portion" of Parcel No. 0025015. Consequently, these "portions" could comprise hundreds of acres. Additionally, the "southwestern border" of Parcel No. 0025021 is thousands of feet long and runs perpendicular to Friendship Baptist Church Road. The notice does not provide any information regarding where along this "southwestern border" the alleged violations occurred. The Plaintiffs' notice is not "sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit," Carney, 2006 WL 4347048, at *5, because it does not identify what "portion" or where on this "border" the alleged violation(s) occurred.

Plaintiffs rely on two cases, Carney and Purvis (both cited *supra*), to contend, in essence, that a generic description of the alleged violation is sufficient. In both cases, the property involved was a small land area with a well-defined waterway running through it. Thus, the description of the area of the alleged violations offered in these cases is distinguishable from the instant case, which involves hundreds of acres and a vague and nebulous "wetland."

Purvis dealt with the commercial development of a distribution center in Douglas County, Georgia. In Purvis, neither the court's opinion nor the plaintiff's NOI detailed the total number of acres involved. However, according to Douglas County, Georgia tax records, the New Manchester Distribution Center is 35.76 acres. (Douglas County Tax Records 9000 Riverside Parkway, attached as Ex. 3.) Additionally, the Purvis plaintiffs alleged "a creek flows

---

[8] In Plaintiff's state court action, they have had a survey of Defendants' property completed, and their wetland scientist expert has inspected the property. Presumably, Plaintiffs could have identified the specific locations where they allege the violations occurred but chose not to, foreclosing Defendants' ability to resolve the issue and prevent the instant lawsuit. The notice requirement is intended to prevent this sort of "hide the ball" gamesmanship.

across this site and eventually empties into the Chattahoochee River." 2006 WL 3709610, at *1. The <u>Purvis</u> plaintiffs' allegations related to a specific creek, not an ill-defined "wetland." In other words, due to the small size of the property and the clearly defined stream, the defendant in <u>Purvis</u> would not have to conduct an extensive investigation to determine the locations of the violations. The <u>Purvis</u> notice enabled the defendant, in light of the facts of that case, to understand fully what the plaintiffs asserted it was doing wrong. That is not the case here. Although Plaintiffs' notice is superficially similar to the NOI approved in <u>Purvis</u>, the instant case is different because the location(s) of the alleged CWA violations are not readily discernible from Plaintiffs' NOI.

Similarly, <u>Carney</u> is easily distinguished when the facts are viewed in context. In <u>Carney</u>, Gordon County, Georgia developed a 75-acre site into the Sonoraville Recreation Complex. The court noted that a creek flowed across the property into other streams and wetlands located downstream. <u>Carney</u>, 2006 WL 4347048, at *1. The <u>Carney</u> court did not note any wetlands on the property, and again the stream was easily discernable. Thus, the NOI in the <u>Carney</u> case is readily distinguished from the instant case because the <u>Carney</u> NOI provided much more specific information to the defendant, given the limited size of the property and the easily discernable waterway. In sharp contrast, Plaintiffs' NOI is insufficient where there are hundreds of acres and various alleged waters at issue, including vague assertions regarding purported "wetlands," leaving Defendants to guess where and exactly how they purportedly violated the CWA.

In addition to the NOI's vague written description of the alleged areas of the violations, Plaintiffs rely on aerial photographs showing literally thousands of acres, including Plaintiffs' property and property not involved in this case. The Plaintiffs assert that this aerial photography provides sufficient notice because it shows the Williamson Swamp Creek and "adjacent

wetlands," a berm, a ditch, a bridge, and a dike.[9]  However, while Plaintiffs may contend these are all shown in the photographs, the photographs do not show where in the vast areas depicted all these features are located and, most importantly, which parts are alleged to be in violation.  In essence, Plaintiffs argue that by showing an aerial photograph depicting thousands of acres and claiming a violation occurred somewhere in the photo, they have provided adequate pre-suit notice.  This does not provide Defendants with enough information to afford them an opportunity to bring themselves into compliance.  Otherwise, in every such CWA case, all the plaintiff would have to do is provide a "Google Earth" photograph, say the violation is somewhere on the photograph, and make the defendant undertake an extensive investigation of the entire area— including property not under the defendant's control—to determine where the alleged violation occurred.  That is not sufficient notice.

Plaintiffs are required to provide Defendants with sufficient information to identify the pertinent aspects of Plaintiffs' claims without forcing Defendants to undergo extensive investigation.  Plaintiffs' NOI fails to meet the governing legal standard because it does not identify the locations where the alleged activity occurred with sufficient detail to allow Defendants to undertake corrective action.  By failing to provide adequate notice, they have deprived Defendants of the opportunity to resolve the potential issues without resort to litigation.  Accordingly, the instant lawsuit should be dismissed.

---

[9] Plaintiff contends that Defendants used "heavy equipment…to construct and discharge enormous banks and berms of fill material in wetlands and a pond that are Waters of the United States on the southwestern border and eastern portions of Parcel No. 0025021 and southeastern portion of Parcel No. 0025015" without specifying where in these "portions" of the parcels—which involve potentially hundreds of acres—these alleged activities occurred.  Due to the size of the property, in order for plaintiffs to comply with the notice provisions they were required to detail the areas where the alleged violations occurred. Plaintiffs' notice requires an extensive investigation essentially to guess where Plaintiffs allege the violations occurred.  Additionally, as noted above, the berm to which Plaintiffs apparently refer was constructed entirely in the uplands of the property.  If there is a specific portion of the berm Plaintiffs allege is in wetlands or waters of the United States, this should have been specified.

**D.      In the Alternative, The Court Should Stay this Case Pursuant to <u>Colorado River</u>.**

 If the Court determines the case should not be dismissed, it should reject Plaintiffs' arguments against <u>Colorado River</u> abstention.  Initially, it bears noting that "[t]here is no bright-line test for determining when an existing, concurrent state case warrants federal court abstention in a parallel federal case."  <u>Carden v. Town of Harpersville</u>, No. 2:15-CV-01381-RDP, 2016 WL 4493059, at *8 (N.D. Ala. Aug. 26, 2016) (citing <u>Ambrosia Coal & Constr. Co. v. Pages Morales</u>, 368 F.3d 1320, 1328 (11th Cir. 2004)).  Rather, as explained in Defendants' initial brief, the Court should consider a variety of factors, and it has discretion to determine, based on the unique facts of the case, the weight to assign to each factor.  (<u>See</u> doc. no. 17 at 15-17 (citing <u>Moorer v. Demopolis Waterworks & Sewer Bd.</u>, 374 F.3d 994, 997 (11th Cir. 2004), and other authorities).)  In <u>Moorer</u>, the Eleventh Circuit determined that it was appropriate to stay a CWA action in favor of a parallel state court proceeding.  <u>See</u> 374 F.3d at 997.

 Yet, Plaintiffs argue the state and federal court actions are not "parallel" because:  (1) Nexton Mining, Inc. ("Nexton") is not a party in the state court suit; (2) the state court suit does not include CWA claims or § 404 claims; and (3) Plaintiffs request relief in their CWA action that is not available in state court.  (Doc. no. 36 at 18.)  Plaintiffs' decision not to sue Nexton[10] in state court does not render the actions non-parallel.  As Defendants explained in their initial brief, the other parties are identical, and the two causes of action involve virtually identical allegations of fact.  Actions are parallel if they involve *substantially* the same parties and issues—the presence of an additional party or claim in one of the suits does not render the actions non-parallel.  <u>See, e.g.</u>, <u>Lumen Const., Inc. v. Brant Const. Co.</u>, 780 F.2d 691, 695 (7th Cir. 1985).  A "'mincing insistence on precise identity' of parties and issues" is not required.  <u>African Methodist Episcopal Church v. Lucien</u>, 756 F.3d 788, 797 (5th Cir. 2014).

---

[10] Nexton, like Defendant Sunflower Farm and Ranch, Inc., is a closely-held corporation owned by Defendants Steven and Kimberly Peters.  (<u>See, e.g.</u>, Compl., ¶¶ 19-23.)

In this regard, Plaintiffs' assertion that the state court action does not include their current CWA claims misses the mark. Plaintiffs' state-court negligence *per se* claims explicitly rely upon the CWA and parallel provisions of the Georgia Water Quality Control Act. (Doc. no. 17-1, ¶¶ 127-41.) Plaintiffs allege in their state court action that Defendants' land-clearing and grading activities have caused the discharge of sediment into Williamson Swamp Creek in violation of the CWA—in essence, the very same claims they raise in the case *sub judice*. (Id.) Although Plaintiffs allege their state court complaint is limited to claims Defendants discharged stormwater without a NPDES permit, nothing prevents Plaintiffs from pursuing a § 404-based claim in state court. Furthermore, in addition to referencing stormwater discharge, Plaintiffs' negligence *per se* claims (which incorporate all the state-court complaint's factual allegations by reference) also refer to the "filling of land," mass grading, and the discharge of "sediment" and "fill material." (See, e.g., id. ¶¶ 37, 45, 54, 57, 59, 63, 72, 73, 75, 77, 84, 95, 96, 98, 127-41.) At their core, both actions are about the alleged discharge of sediment into water bodies on Plaintiffs' property.

As Defendants observed in their initial brief, the state court may exercise concurrent jurisdiction over Plaintiffs' CWA claims, see, e.g., Kopacz v. Hopkinsville Surface & Storm Water Util., 714 F. Supp. 2d 682, 691 (W.D. Ky. 2010), with the lone exception of claims for civil penalties. By any reasonable measure, the state court action is the more comprehensive of the actions. This Court's exclusive jurisdiction over a claim for civil penalties under the CWA does not mean the actions are not parallel—if it did, the Eleventh Circuit's decision in Moorer, cited above, would make no sense. What matters is Plaintiffs may raise all their fundamental theories of liability in the state court action and obtain complete relief in the form of an injunction, compensatory damages (which are not available under the CWA), and punitive damages (also not available under the CWA). See Moorer, 374 F.3d at 997-98 (explaining plaintiff could pursue his CWA-based liability arguments in state court).

The fact that Plaintiffs are pursuing civil penalties in this CWA action does not make abstention inappropriate. Cf. SE Prop. Holdings, LLC v. Parks, No. 14-0050-KD-N, 2014 WL 3687226, at *3 (S.D. Ala. July 24, 2014) (granting motion to stay despite presence of different parties and claims in the federal suit). To illustrate the point, in Allied Mach. Serv., Inc. v. Caterpillar Inc., 841 F. Supp. 406, 410 (S.D. Fla. 1993), the court stayed a federal antitrust action in favor of a state-court antitrust action which had been filed three months before the federal suit, even though the district court had exclusive jurisdiction over the federal antitrust claims. In deciding to abstain, the district court observed: (1) the suits involved identical facts; (2) the state and federal antitrust claims were "substantially similar;" and (3) there was a "strong likelihood" that the district court action would "duplicate the efforts of the state court and reach different factual—and consequently legal—conclusions on the same set of facts." Id. at 410. The court also observed, "[T]he fact that Plaintiff had access to federal court, but chose to proceed in state court initially, weighs strongly in favor of abstention." Id. at 408. The same is true here.

In sum, the actions are parallel, the first-filed state court action affords Plaintiffs with an adequate remedy, and staying the matter *sub judice* will avoid piecemeal litigation. The Court should also consider "the vexatious or reactive nature of either the federal or state litigation" in deciding whether Colorado River abstention is proper. Am. Bankers Ins. Co. of Fla. v. First State Ins. Co., 891 F.2d 882, 884 (11th Cir.1990) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Co., 460 U.S. at 1, 17 n. 20 (1983)). Defendants' alleged affirmative conduct in this case took place from 2013-2015. Plaintiffs did not resort to federal court intervention until April 2017, after their state court action had been pending for roughly 14 months. Although there is no "smoking gun" to indicate forum shopping, the goal of Plaintiffs' pursuit of parallel state and federal court litigation is clear—to multiply the proceedings against Defendants. This is exactly the sort of piecemeal, duplicative litigation Colorado River empowers the Court to prevent.

It is unnecessary to further reiterate the arguments raised in Defendants' initial brief with respect to the <u>Colorado River</u> abstention factors. That said, Plaintiffs cite several cases in which courts declined to issue a stay. These cases do not provide meaningful guidance in this matter.

In <u>Adkins v. VIM Recycling, Inc.</u>, 644 F.3d 483, 499 (7th Cir. 2011), a RCRA case, the court concluded that the actions were not parallel because: (1) the plaintiffs were not parties in the state-court case; (2) the plaintiffs' federal claims could not be addressed in state court because federal courts have exclusive jurisdiction over RCRA suits; and (3) the plaintiffs had no remedy under state law because Indiana had exempted the defendant's alleged conduct from regulation. <u>Adkins</u> sheds no light on the instant case.[11]

<u>Remington v. Mathson</u>, No. CV09-4547 NJV, 2010 WL 1233803, at *9 (N.D. Cal. Mar. 26, 2010), involved RCRA and CERCLA claims that could only be brought in federal court, and the actions were not parallel because the state court case included a quiet title claim that was "unique to the state action and of substantial significance to the state action." Unlike the instant case, resolving the key issues in the state court action at issue in <u>Remington</u> would not have resolved the federal claims, meaning the risks of inconsistent results and piecemeal litigation were far lower in <u>Remington</u> than in the instant case.[12] <u>Id.</u> at *10. In contrast, in the matter *sub judice*, Plaintiffs' negligence per se claims cannot be resolved without determining whether

---

[11] In support of its decision, the <u>Adkins</u> court cited three CWA cases which are all readily distinguishable. <u>Mut. Life Ins. Co. of N.Y. v. Mobil Corp.</u>, No. CIVA96CV1781RSP/DNH, 1998 WL 160820, at *5 (N.D.N.Y. Mar. 31, 1998), included RCRA claims which must be brought in federal court, and the state and federal court actions involved disparate "legal theories and statutes." In <u>Long Island Soundkeeper Fund, Inc. v. N.Y. City Dep't of Envtl. Prot.</u>, 27 F. Supp. 2d 380, 383 (E.D.N.Y. 1998), the New York State Department of Environmental Conservation (not the plaintiffs) filed a "complaint in state court less than one-half hour after plaintiffs filed their complaint in this Court." The federal court action was "filed first," making abstention inappropriate. <u>Id.</u> Similarly, in <u>Pirgim Pub. Interest Lobby v. Dow Chem. Co.</u>, No. 95-CV-73286-DT, 1996 WL 903838, at *1 (E.D. Mich. Feb. 16, 1996), the Michigan Attorney General (not the plaintiff) filed an action in state court *after* it had received notice of the CWA plaintiff's intent to file suit in federal court and *after* the CWA suit had been filed. In sharp contrast to the instant case, the plaintiffs in <u>Long Island Soundkeeper</u> and <u>Dow Chem.</u> did not file in state court, conduct discovery, wait over a year, and then file a federal suit with duplicative claims.

[12] Interestingly, although the <u>Remington</u> court declined to abstain on the federal claims, it did stay state law claims that had been brought in both suits, largely eliminating the risk of inconsistent results and piecemeal litigation. <u>Id.</u> at *10.

Defendants violated the CWA—the very issue in this case. The facts and issues of both actions are intrinsically intertwined, raising not only the prospect of duplicative litigation, but the spectre of potentially inconsistent results.

In Brewer v. City of Bristol, Tenn., 577 F. Supp. 519 (E.D. Tenn. 1983), the Commissioner of the Tennessee Department of Health and Environment—not the plaintiffs— brought a complaint against the defendant before the Tennessee Water Quality Control Board, *after* the plaintiffs had provided notice of their intent to sue under the CWA. Importantly, as the Eleventh Circuit observed in Moorer, 374 F.3d at 997–98, the plaintiffs in Brewer had no right to intervene in the Control Board proceedings. See Brewer, 577 F. Supp. at 527. The two proceedings also sought completely different relief:

> Another obvious difference in the requested relief is that with respect to clean-up operations the plaintiffs ask that the defendants be ordered to restore Boone Lake and Beaver Creek, while the Commissioner orders only the clean-up of the sludge bed. It is possible that the state court proceedings could turn out to be inadequate to fully protect the interests of the plaintiffs.

Id. at 527. Here, Plaintiffs are parties in both actions, and with the lone exception of civil penalties, they have access to a broader range of remedies—including compensatory damages which are not available under the CWA—in state court than they do in this action. Brewer is inapposite.

In Anderson v. TLC Dev. Grp., Inc., No. CIVA 5:06CV97, 2006 WL 3949173, at (1 (M.D. Ga. Aug. 18, 2006), TLC brought suit in state court, and Anderson responded by filing counterclaims and providing notice of his intent to sue under the CWA. When the CWA notice period expired, Anderson filed *all* of his claims in federal court and dismissed his state-court counterclaims. Id. The issues in TLC's state court action and Anderson's CWA case were fundamentally different. TLC's state court suit brought "tort claims for interference with contractual relations arising from alleged contacts between Anderson's wife and a potential buyer of a lot in TLC's development," while Anderson's CWA suit concerned the pollution of a

stream running through both parties' property.  Id. at *3.  Furthermore, although brought first, the district court concluded that TLC's state court suit was "a tactical maneuver to preempt Anderson's ability to file his claims in federal court," and that TLC had filed its state court suit knowing Anderson intended to pursue a CWA claim in federal court.  Id. at *4.  The facts of the instant case are far removed from those in Anderson.  Here, Plaintiffs have filed two suits, more than a year apart, essentially concerning the same conduct and the same injury—the alleged discharge of sediment into water bodies on Plaintiffs' property.

Curiously, Plaintiffs also cite Kopacz., 714 F. Supp. 2d at 690, a case in which the district court concluded it would be inappropriate to stay CWA claims *which the plaintiffs lacked standing to bring*.  In contrast, the court *did* abstain under Colorado River as to the balance of the plaintiffs' federal claims, including claims under the Clean Air Act.  Id. at 692.  At any rate, the Kopacz court noted that the plaintiffs' CWA claims were "wholly new" and relied upon facts not raised in the state court complaint.  Id. at 688.  That is not the case here, where Plaintiffs rely upon virtually the same alleged facts to support both negligence per se claims for violations of the CWA in state court and CWA claims in the captioned case.

Hooker v. Chickerling Properties, LLC, No. 3:06-0849, 2007 WL 1296051 (M.D. Tenn. May 1, 2007), is admittedly closer to being on point.  In that case, the plaintiffs brought state law claims for negligence and violations of the Tennessee Water Quality Control Act before filing a CWA suit in federal district court.  Id. at *1.  While recognizing that it did not have exclusive jurisdiction over the plaintiffs' CWA claims, the district court nevertheless determined that abstention was not warranted.  Id. at *3-5.

Although this case has superficial similarities to Hooker, there are material differences. In Hooker, the state court case involved state-law nuisance claims based on:  (1) the creation of a water retention pond and drainage pipes which allegedly altered the flow of water onto the plaintiffs' property, and (2) the discharge of mud and stormwater onto the plaintiffs' property.

Id. at *1. In their CWA case, the Hooker plaintiffs alleged that the defendant had exceeded the effluent limit for sediment discharges under its NPDES permit for construction-related activities. Id. Although the claims were factually related, the Hooker plaintiffs' state-law claims did not depend upon showing a violation of the CWA. See id. As the Hooker plaintiffs' state and federal claims required proof of different facts, the Hooker court concluded that "the state court case will not dispose of Plaintiffs' CWA claim in this case, nor will the relief necessarily be the same should Plaintiffs prevail in both actions." Id. at *3.

The instant case is different. Plaintiffs' state-law negligence per se claims (which rely upon alleged violations of the CWA) turn on the very same facts and issues as their instant federal CWA claims. Resolving Plaintiffs' CWA-based negligence per se claims in the state-court action will effectively resolve their CWA claims in the instant case, as well. To illustrate, Plaintiffs' negligence per se claims turn largely upon whether Defendants' alleged activities were "agricultural or silvicultural practices" exempted from the CWA and Georgia's parallel Water Quality Control Act. (See doc. no. 17-1, ¶¶ 129-30, 133.) This is the very same issue the Court must resolve in this CWA suit, as Plaintiffs explain in their complaint. (See Compl. ¶¶ 38-48.) Furthermore, both causes of action depend on proof that Defendants have discharged fill material into protected waters. With respect to the CWA-based claims, the very same theories of liability and defenses are at issue in both suits. Consequently, a stay is warranted.

## II. Conclusion

The Court should **GRANT** Defendants' motion and **DISMISS** Plaintiffs' instant CWA suit. In the alternative, abstention is justified under Colorado River, and all proceedings in the captioned matter should be **STAYED** pending the resolution of Plaintiffs' state court suit filed in the Superior Court of Jefferson County, Georgia,

Respectfully submitted, this 21st day of June, 2017.

/s/ John E. Price
N. STATEN BITTING
Georgia Bar No. 058940
JOHN E. PRICE
Georgia Bar No. 142012
Attorneys for Sunflower Farm & Ranch, Inc.,
Steven L. Peters, Ross A. Wenger and Kimberly K.
Peters

OF COUNSEL:
FULCHER HAGLER LLP
One 10th Street, Suite 700
Augusta, GA 30901
(706) 724-0171
Email: sbitting@fulcherlaw.com
Email: jprice@fulcherlaw.com

/s/ Gillian S. Crowl
Gillian S. Crowl
Georgia Bar No. 654746
*Attorneys for Defendant Nexton Mining*

**Gray, Rust, St. Amand, Moffett & Brieske**
1700 Atlanta Plaza
950 East Paces Ferry Road
Atlanta, Georgia 30326
404-870-7375 (Rust)
404-870-7389 (Crowl)
404 870-7374 fax

## CERTIFICATE OF SERVICE

I hereby certify that on June 21st 2017, a copy of the foregoing was electronically served with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to the following attorneys of record:

Tyler J. Sniff
Donald D.J. Stack
Stack & Associates, P.C.
260 Peachtree Street
Suite 1200
Atlanta, GA 30303

J. Skye Wellesley
Michael J. Rust
Gillian S. Crowl
Gray Rust St. Amand Moffett & Brieske, LLP
1700 Atlanta Plaza
950 East Paces Ferry Road
Atlanta, GA  30326

I further certify that a true copy of the foregoing has been served on the following counsel by depositing same in the United States Mail with sufficient postage attached thereto to ensure delivery, addressed as follows:

Harry D. Revell
Nicholson Revell, LP
Gateway Professional Center
4137 Columbia Road
Augusta, GA 30907

J. Franklin Edenfield
Spivey, Carlton & Edenfield, PC
Post Office Box 309
Swainsboro, GA  30401

/s/ John E. Price